Good morning, Your Honors. Michael Neville with the California Attorney General's Office, representing the state officials, defendants below, and appellants here. Your Honor, the recent case of safe air that this Court issued with respect to fuel burning and the Idaho State Implementation Plan focuses, as you know, on the integrity of the rulemaking process. And I think that that is a key concern that the state has with the District Court's decision that it explicitly undermines the rulemaking process. And essentially, the District Court found a backhanded way, well, that may be too strong, a backhanded way of enforcing the inventory methodology. But certainly, there is a contradiction between its entirely appropriate finding that the 1990 inventory, the baseline inventory, and its methodology were not in the terms of the 7604, the citizen suit. Roberts. Counsel, before you get into that level of detail, give us context here. This is a citizen suit. That's correct. This is not a petition for review of an EPA approval. That's correct. And does that have significance in this case? Well, yes, it does have some significance, because the State Implementation Plan that EPA approved back when it approved it, it has official standing and cannot be, you know, with the presumption of regularity for all those reasons. In other words, it's too late to get into whether EPA should or should not have approved. That's correct, Your Honor, 60 days. That issue is foreclosed. That's right. So the issue we have in front of us is the enforcement of particular standards in the SIP. Is that correct? That's correct. All right. So you need an admission standard or limitation as the foundation for your suit, correct? For the plaintiff's suit. That's correct, Your Honor. Yes. And that, I think, is the What is that? Well, the appropriate admission standard or limitation here was the duty of the State officials to make a decision in 1997 based on the evidence that it had at the time, whether regulations were necessary at that time to meet the future targets.  And so, you know, the SIP was not incorporated into the SIP as part of the code of federal regulation. The Wells Memo, and this can get confusing, but the Wells Memo has a bunch of interim standards that were never incorporated as part of the SIP and never approved by EPA. So we certainly So what's the significance of that? I mean, they go away, right? They went away. They went away. So in a sense, the controversy, if you will, about the Wells Memo, we think that the meaning of the rule is plain, that it was not incorporated into the SIP, that it was not approved as part of the code of federal regulation by the EPA. But that controversy is certainly not as important as the one about the nature of the State officials' duty in 1997 to make an appropriate decision as to whether regulations were necessary at the time. But in their – in terms of their duty to make a decision, you're benchmarking that against what? The language that you're relying on that you think they defaulted on. Well, plaintiffs have said that the State somehow manipulated the inventory or was free to manipulate the inventory. Actually, the district court did not make any such finding. It simply said that when the State officials made the decision in 1997 that regulations weren't necessary then with respect to emissions, that it had to, it was required to, to calculate the baseline from 1990 on the backcasting methodology that was conceded and explicitly mentioned in the pesticide plan. Pesticide plan is part of the SIP that says it will be done this way. But when you take a look at the context of that, it's clear that State officials at that time, at the time they drafted the pesticide plan, no inventories, Your Honor, had been calculated. So they were looking – Can I just stop you just for a second? Yes. Because it's a little hard to – I'm sorry if I'm getting too – Well, you know, you guys have been at this a long time, and probably you have the SIP memorized practically at this point. But I just want to make sure I understand your argument. So it seems clear from the language California has an obligation to take a look at whether regulations are necessary. And then California says they're not necessary. But your challenge is to that determination, is that correct? I'm not quite sure I follow you. Well, you see, that's the problem here is that to have a citizen suit, you have to have the emission standard or limitation as the – I don't want to use the word baseline. That's a bad word right now. But as the foundation for a lawsuit. Okay. So I'm just trying to get precisely what standard or limitation, in your view, the State violated or didn't carry through. Well, since I represent the State, Your Honor – I mean, not the State, but what their claim is that you didn't do. What obligation did they say we had that we didn't do? They said – well, the district court said, because you have to understand the district court went ahead with a different theory than what Plaintiff said originally. And that's part of the confusion, perhaps. I think that, frankly, is something that complicates this case. Right. Because we have their – what I thought was their theory, and then we have these two findings, if you will, by the district court who says, well, they seem to be contradictory, but they're not. Yeah. I – we, of course, Your Honor, feel that they are contradictory and that they result in the district court exceeding, going outside the jurisdiction that was granted for omission standards and limitations. Well, aren't you really arguing that the district court had no jurisdiction to get into this whole area because this is a citizen suit, not the PFR? That's correct, Your Honor. Okay. Twelve minutes into the argument, we finally get to it. So you're basically saying if there's a problem with the way this thing was constructed It should have been challenged. That should have been an APA challenge and it would have come up to this Court on a normal review from the agency. That's correct, Your Honor. In the preamble to the CFR, EPA approved it as complying with provisions of the Clean Air Act, as it necessarily must. And so, yes, the provisions of the SIP, what's in there and what isn't, are against the law given, and I think, you know, our obligation was in 1997 to make an appropriate decision. We made an appropriate decision based on the best information available at the time, based on the most accurate information at that time. So it really comes down to the calculation of inventories. And the way that state officials calculated inventories for the base year 1990, which again was the first year, the baseline, was the same for that year as for all subsequent years from 1990 to 2007, which was the last one. We were consistent about it. We multiplied an emission factor by the pounds in the pesticide use report, which are reports from the users themselves. It's a very transparent process. It's an objective standard. The confusion apparently came from a statement that at the time of the plan, back in 1994, we didn't have any inventories. So there was concern and always has been on the part of the State for accuracy. And the thought was we'd need to use backcasts. Let me be sure I understand your argument. El Comite says that the analysis the State eventually made using the PUR was less friendly to the environment, let's say, than the analysis which could have been made by the original numbers. You're suggesting that these were newly developed numbers that occurred after the beginning of this whole process? Well, no, not quite. The way this works is that the inventories were analyzed each year, but I believe we didn't have an inventory at the time that the pesticide plan or the data was there, but inventory had not been calculated. And the concern was that there would be underreporting in that first year, which was 1990, because it was the first year. Then later, after the plan was adopted, we, State officials discovered that in fact the more appropriate to use the objective data, the actual use reports from 1990, rather than trying to backcast or extrapolate backwards from 1991. That's the essence of it. The plaintiffs will argue that that is prohibited by the SIP. What is your answer? The district court held that because the SIP, the pesticide plan, used the term will. Will is necessarily a mandatory end of story, ignoring the fact, and not really analyzing the context in which will is not mandatory under case law. And specifically, the context here was the statement was a means or prediction of the most accurate means of doing the methodology. Turned out the most accurate means was not backcasting from 1991, was to use the actual data. And there's no nefarious scheme to that. But what they would say is, well, that, you know, that's your view as to how it turned out, but even if this Wells memo isn't incorporated, per se, by listing it over here in the front part of the SIP where they list all those documents, that the guts of it got in there anyway in text, and, therefore, that's really what the State had agreed to. Well. I mean, I think that's part of their argument. I think that was their original argument, Your Honor. The guts of it didn't get into the CFR. It's nowhere in the CFR. There's a mention of it in the preamble, but the targets that are set forth in the preamble are different than the interim targets in the Wells memo. And the response was actually to a concern that was raised that the regulatory decision had to be made earlier than 1998, and so it was put in the preamble that it would be made in 1997, which is exactly what occurred. It happened in an appropriate manner. And we submit that the Court exceeded its jurisdiction by ruling appropriately on the one hand that a particular methodology that was contemplated based on the data that it has, a particular methodology of backcasting can't be an emission limitation and standard under the Clean Air Act. He got that right, but then he turned around and said, but even though that's not enforceable, it's mandatory, and the lack of backcasting fatally taints the whole decision in 1997, and you had to go back to EPA to get that SIP resolved. I mean, to make that change, to get a new kind of, to use the actual data, you had to go back to EPA and get them to approve that. That's what it comes down to. Your Honor, I'll be happy to entertain questions, but I see I'm running short on time. I wanted to review a bit for rebuttal, and Intervenor has an argument to present as well. Thank you, counsel. Good morning. May it please the Court. Risa Stewart, appearing on behalf of the Intervenor Air Coalition team. I join in the comments made by Attorney Neville and want to just point out a few facts to the Court. What appeared to have occurred, this is, was in fact a citizen's suit, which can only seek to enforce an emission limit or standard, and what appeared to happen is that we ended up with an order that appears to modify our SIP, which is not authorized by a citizen's suit. And that's ultimately what happened, and that's the error that happened in the trial court. Trial court judge was confused with the SIP process, what documents are part of the SIP process, correctly found that how the baseline inventory was calculated was not an emission limit or an emission standard, and therefore could not be the subject of the citizen's suit, yet then determines that the, because they did not utilize, DPR did not utilize the 1991 inventory and backcast that somehow that caused them to violate the one requirement, which was to take a look and see, are we reducing the VOCs? If we're not, we need to implement regulations. The pesticide element has an indication that we need to set an inventory, and DPR estimated at that time that the 1990 data, which they were required to use by the Clean Air Act, may not be the most accurate. So they predict that in the future when they set this inventory, that it may be more accurate to utilize the following year's data. As the years go, they've analyzed the data, determined the 1990 data is in fact more accurate, and the trial court acknowledged that even if that data was more accurate, you couldn't use it. You're violating what you said. Well, that leads us to what would turn out to be an observed result, that they are required, predicting how they're going to set the baseline, coming up to the future and realizing that's not the most accurate way to do that, and then requiring them to follow that, leads us to a result that's not tolerated by the courts, that's not tolerated by statutory interpretation. You look at the plain language. This was a prediction or an opinion as to how they would calculate it. It was not the plan as to how they would reduce the VOCs. And so that's where we have the error. And the trial court was confused. The SIP process is where, and following the EPA's acknowledgment and adoption of the And so it's our position that the trial court was in error in, one, analyzing that the use of the 1990 data was contrary and led to a violation of an admission standard, and it was error for the trial court to incorporate the Wells Memorandum. So what should they have done? What should the Petitioners do? If the Petitioners thought that there were problems with the SIP, what should they have done? They should have filed the petition in a timely matter after EPA adopted it. So after the final rule. It's a petition for review. Correct. Under that program. Under that strategy, yes, Your Honors. They should have brought the petition for review within the time frame after the final rule was adopted. They did not do that. They waited. They waited until 2004, long after even the 19 the one-time review was required. Foreclosed from petitioning California to change the SIP? They would look at today's SIP. They are foreclosed from going back to the time frame of this 1994 SIP. The time frame has passed. California has adopted new SIPs or new elements to the SIP, and they could bring actions if they're timely.  And in this case they did not. Well, let's suppose Judge Carlton had said, I have no jurisdiction. I buy California in the intervener's argument hook, line, and sinker, and I dismiss this action for lack of jurisdiction. What if the committee was resolute in its belief that there were problems with the SIP? What's their next step? Well, they'd be time barred on this SIP. They'd have to look at the most recent amendments to the SIP and see if they had an opportunity there. I believe that they are barred. This action is too late. There's no regulatory petitioning mechanism that they could ask California to change its mind? I think they would be time barred, unless it was recently before the State. But I would defer that question to the Deputy Attorney General, and I see my time is up. Thank you, counsel. Thank you. Could you answer one quick question? Sure. Who's your client? Our coalition team. They are an association of agricultural businesses, and they were the interveners in this action. They're agricultural interests? Yes. Okay. Thank you. Thank you, counsel. We'll hear from the Plaintiff Appellee. Good morning. May it please the Court. My name is Brent Newell. I'm appearing for El Comité. I'd like to start with that admission standard or limitation issue that the Court was discussing earlier. The resolution of that issue is found in this Court's decision in Bayview. The admission standard or limitation here is the Wells Memorandum. It specifies that the State will adopt regulations by a given date based on an evaluation of the necessity of those regulations comparing them to the 1990 baseline. Well, that's a little bit of a bootstrap. It presupposes that the Wells Memorandum is part of the SIP. But the threshold question, do you agree with Stewart in particular that we're dealing with a citizen suit here, not a petition for review of EPA approval of the SIP? This is a citizen suit to enforce the Wells Memorandum. This is not a challenge to the SIP. Well, it's to enforce an admission standard of the SIP. Correct. Now, the Wells Memorandum is a hotly disputed issue in terms of whether it is or is not part of the SIP. Correct. So are we in agreement to that extent? We're in agreement that El Comité is seeking to enforce an admission standard or limitation, which we argue is the Wells Memorandum. I'll explain why it's a valid cause of action, and the Court has jurisdiction. In Bayview, the Court, this Court, was looking at a transportation control measure that had several subparts. And the Court, this is at pages 700 through 701 of that opinion, the Court evaluated the transportation control measure and said that, quote, if transportation control measure 2 is read to impose an obligation binding on the Metropolitan Transportation Commission to achieve a ridership increase, then those other parts of transportation control measure 2 must be read to be part of that obligation. That is to say, applying Bayview to this case, because the Wells Memorandum says that the State has to evaluate the necessity of regulations, how the State determines the baseline is part of the obligation in the Wells Memorandum. But that seems to me to kind of beg the question, because the first thing you do is you look at the SIP, and then they have an obligation to determine whether or not they need new regulations or need further regulations. Everybody agrees with that. And then the only question is, against what do they benchmark it? But if the Wells, if they have no obligation outside of what's in the SIP to do anything, do you agree with that? I agree that if it's not in the SIP, they have no obligation. Okay. So then we're right back to the only question is, is the Wells memo part of the SIP? That's right. And your best argument for that is? My best argument for that, Your Honor, I want to talk about the administrative intent under SAFARE first, and then I want to talk about plain meaning and absurdity. Those are the three factors under SAFARE. So if the Court would turn to tab 2 of the red brief, I'd like to direct the Court to the statement of administrative intent in the proposed rule, which is the most valuable statement of administrative intent under SAFARE. At tab 2 of the red brief, Your Honors, page 10935. Why don't you tell me what it is, because I'm using rules, not the red brief. Okay. It's the proposed rule. Okay. Got it. And it's on page 10935. In the center column of that page, under heading 4A, which is review of measure, I'd like to direct the Court to the sentence that begins with, in May 1995. Quote, in May 1995, California used a similar mechanism to clarify the technical details of the pesticide commitment. And there's a footnote, footnote number 5. Footnote number 5 refers to the May 1995 Wells Memorandum, which was submitted to EPA under a May 11, 1995 letter. That May 11, 1995 letter is in El Comité's supplemental excerpts of record at page 8. The next sentence says, this clarification is considered part of California's SIP. EPA's administrative intent in the proposed rule under SAFARE is essential because that is the statement of administrative intent on which the public had the opportunity to comment. That's why the proposed rule is so important under SAFARE, because that is what the public had an opportunity to respond to. The final rule, which is attached to tab 3 to the red brief, the final rule, I'd like to direct you to more statements of EPA's administrative intent. This statement of administrative intent is not as important as in the proposed rule, but it is valuable because it confirms what happened in the proposed rule. On page 1169 of that final rule, in the center column under the heading 4B, EPA responded to a comment from the Environmental Defense Center. The second paragraph of that response, which is on the next page, 1170, I'd like to read a sentence to you that begins with, on May 11, 1995, EPA responds to the Environmental Defense Center's comment by saying I'm sorry, I didn't catch that. Where does that? I apologize, Your Honor. It's on page 1170 of the final rule. All right. I'm there. And it's in the left-hand column. Right. It's a new paragraph that begins on May 11, 1995. Oh, I see it. I see it. All right. Thank you. Thank you. So the final rule reads, quote, on May 11, 1995, CARB submitted a clarification by the California Department of Pesticide Regulation. And in parentheticals, they refer to the Wells Memorandum. It continues, to the pesticide element of the SIP submitted on November 14, 1994. This SIP clarification, which was cited in the Notice of Proposed Rulemaking, NPRM, states in part, and it goes on to quote from the Wells Memorandum, EPA's administrative intent is reconfirmed by this response to the comment of the Environmental Defense Center. Now, earlier there was some questioning of counsel for state appellants or intervenors where they said, you know, should someone have challenged the SIP at that point? Should they have challenged the adoption back in 1997? That begs the question, really, how would the Environmental Defense Center had known, how would they have known that they needed to challenge the exclusion of the Wells Memorandum from the SIP based on this administrative intent? Here's the difficulty I'm having with that. That, of course, is a saying that's a comment to an inquiry or to a citizen comment. If you go to the very beginning, which talks about the summary, which is page 1150, it says, you know, CARB submitted these SIP revisions to the EPA, and then it lists all the revisions. EPA is approving these revisions to the California SIP under the Clean Air Act. So that seems to me to be the listing of the revisions that are being submitted. And if you start getting into clarifications and other things that may exist that are not actually approved, then I'm not sure where you begin and end in the administrative process. So if your question was how would we have known, well, nothing is listed there, that's how you would have known that there could be a problem. It is true that it's not listed up in the front on the first page of the final rule. However, in the specific response to comment about the enforceability of the pesticide measure, EPA does state and quote this Wells Memorandum. Well, in page 1170, it says, any regulations necessary, it's wide open. There is no regulation. There is no benchmark. There is no specific mission standard. Which is interesting, Judge O'Scanlan, because if the necessity of regulations was indeed left at the unfettered discretion of the State, then the pesticide element would be unenforceable. The controls in a SIP must be enforceable. This Court should presume that EPA's – should give EPA a presumption of regularity in their approval of the SIP. That is, EPA should not have approved an unenforceable control measure. The – Well, but if that – if that were the case, then it would be an attack on the SIP approval, which would be not a citizen suit. No. Why not? Well, because our allegation in the complaint is that the Wells Memorandum is an emission standard limitation. No, no. But if we were to take your response to Judge O'Scanlan, which is, well, then you would put us in this difficult box of having basically an unenforceable SIP. But if that's the box we're in, the challenge to that is not a citizen suit, is it? Well, I think that the presumption of regularity is not necessarily whether we're challenging the EPA's approval or not. I believe it's an element in the interpretation of the SIP that Judge Carlton used. He went back and said, well, I've got to afford that EPA did what it was supposed to do. I need to presume that they did that. So if I'm looking at this Wells Memorandum, it needs to be in the SIP. Because one thing that the record shows is that EPA twisted California's arm to get the Wells Memorandum. EPA sent letters to the state saying, you need to strengthen this commitment. You need to make it enforceable. California finally relented and submitted the Wells Memorandum. Under SAFE Air, it would be absurd to interpret the SIP to not include the Wells Memorandum because EPA went to such pains to exact that commitment from California in order to make the SIP approvable. Are you saying the Wells Memorandum in and of itself establishes the regulation? Yes. The standard? Yes, Your Honor. The Wells Memorandum establishes the enforceable emission standard or limitation in this case. Which is the back cast method? Which is the state must adopt regulations that are necessary to achieve specific reductions by specific years. The necessity of those regulations are cast against a measuring stick. The measuring stick is the 1990 baseline. Okay, so now there's two separate things there. The numerical standard that the state has to meet with its regulations. You're now tying to the back cast method, correct? Or are they two separate things in your view? No, they're part of the same strategy. To use the language from the Bayview case. And that makes me even more nervous because strategies don't sound to me like emission standards. So I'm trying to get to what the emission ‑‑ I'm trying to get what the standard is. And you're saying the standard includes the methodology, correct? Yes. Yes. The Bayview case, which we cited in our brief, and I believe Judge Hawkins was on the panel, made a distinction between what citizens could enforce in a SIP and what citizens could not enforce in a SIP. And that distinction was between strategies and goals. The reason the Wells Memorandum is enforceable as an emission standard or limitation as defined by the Act and as a strategy as delineated by Bayview is that it lays out the means by which the State is going to achieve emissions reductions. Again, in Bayview, the Court said if that transportation control measure is enforceable, then we also read the components of that to be part of the enforceability of that strategy. So when I'm referring to, and I realize that this is a very complicated SIP and a very complicated process, but the components of the Wells Memorandum require the State to decide whether regulations are necessary. How does the State decide whether regulations are necessary? In the Wells Memorandum, it says from the 1990 baseline. That measuring stick determines whether regulations are necessary. You see, this is what's bothering me and perhaps bothering my colleague as well. Typically, the larger picture is that for citizen suits, there are numbers, there are standards out there that are reasonably, easily determinable, and the question is, did, were they complied with or not? And it's designed in terms of environmental enforcement to provide that atmosphere. Here, EPA made the conscious decision of allowing the State of California to determine whether or not regulations or standards were necessary in the future. That was a policy judgment that the EPA made, and it seems to me that they gave up the power that they certainly had to insist upon numbers. And since they didn't insist upon numbers, I just don't see how you can say they're enforceable. Well, when the Wells Memorandum is read, the plain meaning of the Wells Memorandum says that the State will adopt the regulations that are necessary to meet standards, to meet percentage reductions from the 1990 baseline. I'm saying that under Bayview, that measuring stick, the 1990 baseline, incorporates the calculation procedures for what that 1990 baseline is. Okay. So, and that's really where we end up, because if you go to the next paragraph of the pesticide section, it basically, when you talk about it having no standard, it does have a standard. It says you have to do exactly what you said, 20 percent of the 1990 base year emissions. Yes. So that is a tangible objective standard. Yes, it is a tangible objective standard. All that we're fighting over is whether or not the base year is calculated one way or another, correct? That's correct. And the SIP lays out how the base year is calculated. It says that it will be done using 1991 data. Well, that's if the Wells Memo is part of the SIP. And also if that methodology is tantamount to an emission standard as well. Yes. The Wells Memorandum is part of the SIP because of EPA's expressed administrative intent in the documents available to the public. The plain meaning of the SIP also resolves that issue of whether the Wells Memorandum is in the SIP. Was that your third point, the plain meaning? The plain meaning is the SIP. The plain meaning comes – it seems to me there's three parts that we have to look at. One, we have to look at all the documents that are incorporated, which doesn't include the Wells Memo. Then we look at the comment that you referenced about May 11th, and then we look at paragraph C. Actually, what the Court looks to for the plain meaning are the documents that the State submits to EPA, because the State, in this cooperative scheme of federalism, the State submits the SIP to EPA. What is in the plain meaning of the SIP are in the documents that EPA – that the State gives to EPA. And those are normally called SIP revisions, correct? Correct. Okay. So we don't look at every document they gave to the EPA. Well, I want to point the Court to one document. No, answer that question first. I'm sorry. Not every document between the State and EPA is part of the SIP. Well, anything that the State is submitting to EPA to justify the approval of its strategy is part of the SIP. Whether it's enforceable or not is a question that's resolved under Bayview. Well, the SIP – what's the purpose? There's all kinds of documents that go back and forth that are not necessarily revisions. So it can't be every document. It has to be a SIP revision, correct? Well, I believe that what was submitted to EPA in this case. No, let me answer my question first before we get to what you believe. And that is, in the administrative process, there's all kinds of correspondence and back and forth. So at some point, there's got to be something that constitutes a SIP revision, correct? Yes. Okay. Yes. And here it tells you that the SIP revision relates to this June 13, 1996. And if I go to that SIP revision, it doesn't say anything about that casting data, correct? Right. That's the Howe Camp letter. When the Court looks at the Howe Camp letter, the plain meaning of the Howe Camp letter, it restates what the ultimate objective is from the Wells Memorandum. It says, quote, Commitment is for a 20 percent reduction from 1990 levels by 2005 in each SIP area. That's at excerpt of record page 96. Well, the problem with that, of course, this is after the fact, isn't it? It's after the public had an opportunity to comment, correct, Your Honor. So. But it doesn't say anything about back cast or does it? It doesn't say anything about back casting. Where the back casting component comes in. So let's just start there. I mean, in other words, it's typical that in these administrative proceedings that there are items that are not part of the initial public comment that ultimately make it into there. And I guess the Howe Camp letter would be an example. But that letter is listed as a specific SIP revision. But it doesn't include the methodology that is in dispute here. Am I correct? You're correct that the Howe Camp letter does not include the back casting. The back casting, how the State will calculate the baseline, is in the original pesticide element, which was submitted on November 15th or 14th, 1994. The Howe Camp letter did not rescind the Wells memorandum. Nothing in the Howe Camp letter says it's rescinding the Wells memorandum. So if you help me out, just one other thing. Sure. Of the documents listed in the summary of what is approved as SIP revisions, do any of those documents include the back casting method? Because you just referenced one document, and I just wanted to see if there was one. Yes. Yes. The pesticide element is referenced in, is incorporated by reference. I could give the Court the exact citation. There are about eight different subsections. But what would be the date of the document that includes it? November 15th, 1994. It's called the pesticide element. It's in the original document that the State submitted. The Wells memorandum, plain meaning of the Wells memorandum, says this is a clarification of that document. So the 40 CFRs incorporate by reference the pesticide element. The Wells memorandum says that it's a clarification of that which was incorporated by reference. So the Howe Camp letter does not change the Wells memorandum. And it restated the ultimate objective that was to be achieved. Thank you, Counsel. Your time has expired. Thank you, Your Honor. Thank you very much. There is some reserve time on the other side. I'm not sure how that's going to be allocated. But as you're coming to the lectern, my first question will be, do you agree with opposing counsel in his interpretation of Bayview? Your Honor, no, I do not. Bayview was all about provisions that made it into the final plan. And which ones of those were, you know, directly enforceable, and which one of those, like, I believe, the public ridership transit situation, were aspirational in the words of this Court. Here we have a rather different situation. We have the attempt to enforce a memorandum that never made it into the final plan. He says that it's part of, incorporated in the November 15, 1994 document, which is part of the listed. Okay. Then if I could, Your Honor, I will, I believe that was on at Federal Register 62, whatever, 1170, the final rule. And if I could just, counsel read from that. If I could just bear with you. There is a reference, indeed, to the 1995 Wells memo in the preamble. There is no reference, whatever, as you. Wait, wait. I'm sorry. Here's my question. Okay. He said, well, first of all, I looked at the preamble and the summary and I looked at all the list of dates. Yes. Okay. So he said, is this information that you're talking about within the Wells memo in any of those documents? And he was up front. He says the Wells memo isn't in there. Okay. But then he said that November 15, 1994, which is one of the documents listed, he said the back casting is incorporated by reference. So my question is really twofold. One, is that true in your view? And two, if it is true, why then would it not be enforceable as part of the SIP? I don't recall there being a reference to, in any of these documents, Your Honor, any of the letters to the back casting. Well, let me just ask then. Let's assume that there were such a reference that's listed in these dates and documents that are approved by, as part of the California SIP. Let's just assume it. Would that not then be enforceable against the State as to its methodology? Not if it were in the 1995 Wells memo, Your Honor. And here's why. It does seem a little odd that we have a reference in the preamble to this memorandum, which was not incorporated into the actual rule. And, but I think it can be explained by the fact that there was a response to, well, there was a response to the concern about the regulations being in 1998 that was moved up to 1997. What's really critical is to follow down at page 1170 and notice that the reductions from pesticides measures and the timetable laid out there is completely different from the interim ones that were in the Wells memo. So there's a contradiction there. Well, what if we get to the bottom of all this and we say, you know what, it's impossible to tell exactly what the meaning of this is. Does that mean that there needs to be a trial to determine what the meaning of this is? I don't think so, Your Honor, because, emphatically not, because it's really a question of legal interpretation. And I know I'm What if it's ambiguous? Well, there isn't any ambiguity. No, you don't think so. But what if we thought so? If you thought the rule was ambiguous. Well, we thought we can't determine. Wells is mentioned, but it's not mentioned. It's incorporated by preamble, but not here. And we were left with who knows. Would that then call for a trial? I don't think so, Your Honor. It's essentially a question of law. It's either in the SIPP or not. So you're saying that you're willing to stand, win, or lose on the Wells memo being incorporated or not as a matter of law? Well, yes. Okay. Thank you, counsel. Our questions took both counsel way over time today, and I appreciate your I had a thought on the remedy, but it sounds like I better not go there. Well, I think you've probably covered it in the brief. All right. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Hawkins, McKeown